# State of New York Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 66
The People &c.,
        Respondent,
    v.
George Garcia,
        Appellant.

Matthew Bova, for appellant.
Steven C. Wu, for respondent.
Hon. Letitia James, New York State Attorney General, intervenor.

HALLIGAN, J.:

Defendant George Garcia argues that his conviction for two counts of criminal possession of a weapon in the second degree (*see* Penal Law § 265.03 [1] [b], [3]) should be reversed because the trial court impermissibly limited questioning during voir dire. He

- 1 -

also argues that his sentence—the statutory minimum term of 3½ years in prison—violates the Eighth Amendment given his risk of serious illness or death from COVID-19, and that the Appellate Division had the power to reduce his sentence below the statutory minimum. None of these contentions provides grounds for reversal. Garcia further argues for the first time in this Court that the statutory provisions under which he was convicted are unconstitutional in light of *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S Ct 2111 (2022). These arguments are unpreserved, and for the reasons set forth in *People v Cabrera* (decided today), we do not reach them.

The incident giving rise to this appeal took place in July 2017. According to testimony at trial, while Garcia and his girlfriend were at a New York City nightclub, an unknown man verbally and physically accosted the girlfriend. A physical altercation between the man and the couple ensued, and club security ejected them from the club. Garcia recalled hearing the stranger threaten him as they left, and then seeing four or five people behind them as they walked toward their car. Speculating that these individuals might be friends of the stranger who had assaulted his girlfriend, Garcia retrieved his gun and began walking back toward the nightclub.

Garcia had purchased the gun a few years earlier and obtained a license from the state of Utah. On the night before the incident, he loaded the gun and placed it in the trunk of his car in anticipation of a visit to a New Jersey gun range the following day. At trial, Garcia testified that he intended to use the weapon to "scare" the people he believed were following him; several days after the incident, he was recorded saying he was "gonna light that [person] up that night" and "[the person] was lucky the cops came before [Garcia]

did." When two police officers spotted Garcia with the loaded weapon in hand, they arrested him.

Following a January 2019 jury trial, Garcia was convicted of two counts of criminal possession of a weapon in the second degree—one count for possessing a loaded gun outside his home or place of business under Penal Law § 265.03 (3) and one count for possessing a loaded gun with the intent to use it unlawfully against another person under Penal Law § 265.03 (1) (b). Supreme Court sentenced him to the statutory minimum sentence, two 3½-year terms in prison to be served concurrently.

In July 2020, Garcia, who was 67 years old at the time and suffered from various serious medical conditions, moved under CPL 440.20 to set aside his sentence. He alleged that his incarceration during the COVID-19 pandemic put him at an elevated risk of serious illness or death and therefore constituted cruel and unusual punishment and a violation of substantive due process under provisions of the United States and New York Constitutions. In August 2020, Supreme Court denied Garcia's CPL 440.20 motion, noting the lack of reported COVID-19 cases in his facility at the time, and reasoning that as to proportionality, Garcia had received the minimum statutory sentence.[1] The denial was without prejudice to renewal, should Garcia marshal more evidence or should conditions change with respect to Garcia's health or conditions of confinement. The defendant

---

[1] In October 2020, the court granted Garcia's motion for a stay of the judgment pending appeal and a release on his own recognizance pursuant to CPL 460.50 because it found he presented "minimal flight risk," and his continued incarceration posed "significant risk" to his health given the COVID-19 pandemic. The Appellate Division continued the stay through the pendency of Garcia's consolidated appeals, and a Judge of this Court extended it through the duration of this Court's proceedings.

appealed from both the judgment and the denial of his CPL 440.20 motion. In a consolidated opinion, the Appellate Division held that Supreme Court had not abused its discretion with regard to the voir dire at Garcia's trial, and that the motion court had correctly declined to set aside his sentence under CPL 440.20. A Judge of this Court then granted leave to appeal.

Two of Garcia's challenges pertain to voir dire. He argues that Supreme Court erred by barring defense counsel from examining potential jurors about self-defense as a justification and by limiting questions about gun ownership in the fifth round of questioning. When speaking to the first panel of potential jurors, defense counsel tried to ask whether anyone objected generally to the idea of using a firearm in self-defense. The court sustained the People's objection, noting that justification could at best negate the requirement that a gun be possessed with intent to use it unlawfully against another, but was not a defense to possession. The parties were allowed to query potential jurors about whether they could follow the law as instructed and whether they could be fair and impartial, and defense counsel was permitted to ask successive panels broad questions about their views on guns and gun ownership.

After four rounds of voir dire, the original pool was exhausted. Prior to questioning the supplemental pool, the court asked the parties to rein in their questioning because counsels' broad questions were confusing the jurors and causing them to speculate about

the case.[2]  Midway through questioning the fifth panel, defense counsel asked jurors to raise their hands if they thought that non-law enforcement personnel should be allowed to possess guns.  Supreme Court instructed that the proper question was "will the jurors be able and willing to follow the law in our state as it applies to firearms?"  When defense counsel continued to ask about each panel's "personal opinion" regarding firearm ownership, Supreme Court again rebuffed his attempts.

Throughout the process, the court took an active role in questioning the jurors, noting not only their answers, but whether they seemed "equivocal" on being able to follow the law and whether their body language indicated strong, insurmountable, or emotional reactions to guns.  The court struck several panelists for cause, and the parties liberally used their peremptory challenges.  As Garcia notes, the court ultimately instructed the jury that lawful justification could pose a defense to the intent element of one of the charged crimes, and the jury's notes focused on this instruction.

A trial court "has broad discretion to control and restrict the scope of the voir dire examination" (*People v Boulware*, 29 NY2d 135, 139, 140 [1971] [italics omitted]).  It is essential, though, that both sides have "a fair opportunity to question the prospective jurors as to any unexplored matter affecting their qualifications" (CPL 270.15 [1] [c]).  That standard was satisfied here.

---

[2] For example, in response to a line of questions related to the jurors' views on firearms, one juror responded that defense counsel was "making it a little bit confusing" by "presenting a lot of evidence" in a selective, "piecemeal" fashion and asking them to "judge" prior to the trial.

Relying on *People v Miller*, 28 NY3d 355 (2016), Garcia contends that the court impermissibly curtailed his opportunity to explore the jury's potential biases related to the use of guns for self-defense. *Miller* explained that questions regarding jurors' "ability to follow and apply the law" go to "the heart of determining whether those jurors could be impartial and afford defendant a fair trial" (*id.* at 359). Thus, where the trial court completely precluded any questions about whether jurors could disregard an involuntary confession and refused to make its own inquiry on the topic because the prosecution had not yet decided to introduce defendant's statements at trial and then later introduced them, the court abused its discretion (*id.*).

This case is distinguishable from *Miller*. To be sure, notwithstanding the "broad discretion" of the trial judge to manage voir dire, any restrictions imposed must still afford counsel fair opportunity to question prospective jurors about "relevant matters" (*see People v Miller*, 28 NY3d 355, 358 [2016]; dissenting op at 24). But here, unlike in *Miller*, while the trial court precluded general questions about jurors' views on self-defense, counsel and the court both questioned jurors extensively about their ability to be fair given the facts of the case, including asking jurors broad questions such as their view on "the whole issue of gun control" and "gun licensing," and their ability to "apply the law that applies to this case" as instructed notwithstanding those personal views. On this record, we do not agree that the trial court abused its discretion such that the jurors' ability to follow and apply the law as to Garcia's defense for his actions was inadequately explored.

Garcia also contends that the court improperly curtailed the questioning of the fifth panel. Given that previous panels had expressed confusion over the expansive questions,

and defense counsel was able to ask the jurors on the fifth panel a series of abstract questions about their personal views, including on guns, mass shootings, licensed guns, gun control, and whether they had any "moral or political objection[s]" to individual firearm ownership, this argument is unpersuasive. Garcia's contention that it was necessary to ask these jurors additional general questions about gun policy and unlicensed firearms so they could fully appreciate their own biases is similarly unavailing. Counsel asked a sufficiently broad series of questions to elicit jurors' personal views, including on gun policy generally and whether they could be fair to a defendant accused of illegally possessing a firearm. In our view, no abuse of discretion is apparent on these facts.

Garcia further argues that the trial court should have vacated his sentence under CPL 440.20 because his age and health conditions put him at a higher risk of serious death or illness from COVID-19, rendering his sentence unconstitutional under the Eighth Amendment, particularly considering the equities of his case. On the record before us, this claim does not provide a basis for reversal of the decisions below. Nor could the Appellate Division have reduced his sentence below the statutory minimum (*see* CPL 470.20 [6]; *People v Harcq*, 292 NY 321, 325 [1944]).

Finally, Garcia argues that *New York State Rifle & Pistol Assn., Inc. v Bruen*, 142 S Ct 2111 (2022), renders Penal Law § 265.03 (3), § 265.03 (1) (b), and § 265.15 (4) facially unconstitutional, and renders § 265.03 (3) unconstitutional as applied to him, claiming that because he held a Utah license, the only reason he did not possess a New York license must have been the "proper cause" requirement invalidated in *Bruen*. Both defendant's facial

and as-applied challenges require preservation for the same reasons set forth in *People v Cabrera* (decided today).  Therefore, we do not reach them.

Accordingly, the order of the Appellate Division should be affirmed.

RIVERA, J. (dissenting):

Defendant George Garcia was convicted upon a jury verdict of two counts of second-degree weapons possession (Penal Law § 265.03 [3] and Penal Law § 265.03 [1] [b]), for threatening someone with a gun. Defendant advances several arguments in support of his appeal. I dissent because two of these claims have merit and require reversal of his conviction.[1]

---

[1] I agree with the majority that, on the record before us, defendant's Eighth Amendment challenge to his incarceration during the COVID pandemic does not provide grounds for reversal, and the Appellate Division was correct that it did not have the power to reduce defendant's sentence below the statutory minimum (majority op at 6-7).

- 1 -

The presumption in Penal Law § 265.03 (1) (b) that unlicensed possession is evidence of intent to use the weapon unlawfully is unconstitutional and therefore defendant's conviction on this count should be reversed and the count dismissed. Additionally, the court abused its discretion and prejudiced defendant by limiting defendant's voir dire questions related to gun control and justification. Therefore, his conviction on the single other remaining charge should be reversed and a new trial ordered.

I.

According to the evidence at trial, defendant is a New York City resident with no prior criminal history. Approximately a year before the events leading to his arrest and prosecution, he had purchased and licensed a gun in Utah. He testified that did not apply for a New York gun possession license because of costs and geographic limitations on his possession in New York City. Although he kept the gun at home in a lockbox, on the day he was arrested he had put the gun in the trunk of his car out of convenience because he was taking his girlfriend to a nightclub that evening and then going to a gun range the following day. At the club, defendant and another man began fighting and defendant and his girlfriend were asked to leave. Once outside, the man confronted them and told defendant he was "going to get him." Defendant testified that he noticed five people following him and he feared for his life, so he retrieved the gun from his car and walked towards the group. At that moment an officer intervened, arrested defendant without incident, and recovered the gun.

During four rounds of voir dire, defense counsel successfully challenged for cause several potential jurors who demonstrated bias and an inability to render a fair verdict based on their views on gun ownership and gun control. Over defense counsel's objection, the court limited that line of questioning during the fifth and final round. The court also prohibited questioning over defense counsel's objections regarding justification. Nonetheless, the court eventually charged the jurors that:

> "The term intent means conscious objective or purpose . . . Jurors, under our law, the possession of any person of any . . . weapon is presumptive evidence of intent to use the same unlawfully against another . . . The defense of justification, which is commonly known as the defense of self-defense, does not apply to this case, because the defense, justification, applies only to the actual use of force. You may, however, in determining whether or not the defendant had the intent required for this crime, consider the following: The use of a firearm to engage in conduct that is justifiable under the law is not unlawful. Thus, an intent to use a firearm against another justifiably is not an intent to use it unlawfully."

During deliberations, the jury submitted three notes: 1) inquiring whether it was possible to hold a loaded weapon without intent to unlawfully use it, 2) requesting clarification of "unlawful," and 3) asking whether it was "unlawful to scare someone with a gun." The court largely read back the same jury charge, and stated, "if the only intent you find . . . was to use the gun . . . justifiably, then it would not be unlawful," and "it is unlawful to scare someone with a gun unless the person's intent is justified." The jury convicted defendant of two counts of criminal possession of a weapon in the second degree.

II.

<u>Defendant's Post-*Bruen* Second Amendment Challenge</u>

Defendant first challenges his conviction as a violation of his Second Amendment right to possess a firearm in public. Defendant contends that under the United States Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v Bruen* (142 S Ct 2111 [2022]) the entirety of New York's gun possession licensing regime is unconstitutional, and the statute is unconstitutional as applied to him because his possession of an out-of-state license indicates he would have been licensed in New York but for the proper cause provision in New York's licensing regime. He further argues that there is no historical tradition—as required by the *Bruen* majority—to justify the presumption in Penal Law § 265.03 (1) (b) that mere firearm possession is evidence of intent to use unlawfully. Unlike the majority, I conclude that defendant's *Bruen* claims fall within an exception to our preservation rules. On the merits, defendant's facial challenge to the licensing regime fails, but his challenge to the statutory presumption requires reversal of his conviction under Penal Law § 265.03 and dismissal of that charge.

Courts throughout the country are facing challenges to federal and state gun control laws similar to those asserted here and in five other appeals: *People v Pastrana*, *People v Cabrera*, *People v David*, *People v Telfair,* and *People v Rivera*. Several courts have found merit in these early *Bruen*-based attacks on gun regulation. Delaware's federal district court determined that plaintiffs were likely to prevail in their challenge to bans on ghost guns[2]

---

[2] "Ghost guns" are assembled from parts separately purchased to make homemade, untraceable guns that do not have serial numbers (Annie Karni & Chris Cameron, *'Ghost*

(*Rigby v Jennings*, 630 F Supp 3d 602 [D Del 2022]). A West Virginia federal district court found unconstitutional a ban on possessing guns with obliterated serial numbers (*United States v Price*, 635 F Supp 3d 455 [SDW Va 2022]). The federal district court of Maryland granted a preliminary injunction in favor of plaintiffs challenging firearm restrictions within 1,000 feet of public demonstrations, locations selling alcohol, and private property absent permission of the owner (*Kipke v Moore*, 2023 WL 6381503 [D Md Sept 29, 2023, No. CV GLR-23-1293]). The Massachusetts Supreme Judicial Court concluded that under *Bruen*, absence of licensure is an essential element of the state's illegal gun possession laws, the trial court's failure to instruct the jury on that element was reversible error, and upon reconsideration held that double jeopardy does not bar the defendant's retrial (*Commonwealth v Guardado*, 491 Mass 666, 668, 206 NE3d 512, 522 [2023], opinion vacated in part on reconsideration, 2023 WL 7029883 [Mass Oct 26, 2023, No. SJC-13315]. And the Fifth Circuit struck down a federal law prohibiting possession of firearms by persons subject to domestic violence orders of protection (*United States v Rahimi*, 61 F 4th 443 [5th Cir], cert granted, 143 S Ct 2688 [2023]).

As these cases illustrate, the *Bruen* majority has wrought a change in the law with immeasurable effects on the safety of our neighborhoods. The Supreme Court will have to answer open questions regarding what regulations are constitutional under its "rigid history-only approach" (*Bruen*, 142 S Ct at 2174 [Breyer, J., dissenting]; *see United States*

---

*Guns': What They Are and Why There's a Fight Over Them*, NY Times, Aug. 8, 2023). *Rigby v Jennings* concerned possession of unserialized guns and certain firearm component parts used to make these "ghost guns" (630 F Supp 3d 602, 607 [D. Del. 2022]).

*v Rahimi*, 61 F 4th 443 [5th Cir], cert granted, 143 S Ct 2688 [2023]). We are in uncharted

and dangerous territory, waiting to see how the law will develop in this post-*Bruen* era. But

with or without the Supreme Court's introspection, it falls to the rest of the federal and

state judiciary to determine what legislatures may do to curb gun violence. For now, the

majority has merely delayed resolution of these first *Bruen*-spawned challenges to our

State's gun laws (*People v Cabrera*, decided today, majority op at 2).

A.

Standing

Two threshold matters are presented on this appeal. First, the Attorney General

Intervenor unpersuasively argues that defendant does not have standing to bring his claims.

The United States Supreme Court has consistently held that a defendant has standing to

challenge the constitutionality of a licensing scheme that underlies their criminal

prosecution, even if the defendant did not apply for the license (*see Shuttlesworth v City of

Birmingham*, 394 US 147, 151 [1969] [the defendant, convicted under a statute that

criminalized participating in public parades or demonstrations without a permit, had

standing to challenge law even though he did not apply for permit]; *Staub v City of Baxley*,

355 US 313, 319 [1958], citing *Smith v Cahoon*, 283 US 553, 562 [1931]; *Lovell v City of

Griffin*, 303 US 444, 452 [1938] ["The decisions of this Court have uniformly held that the

failure to apply for a license under an ordinance which on its face violates the Constitution

does not preclude review in this Court of a judgment of conviction under such an

ordinance"]). The cases relied on by the prosecution and the Attorney General Intervenor are both civil injunction licensure cases, rather than criminal cases, and are accordingly distinguishable (*Allen v Wright*, 468 US 737 [1984]; *Moose Lodge No. 107 v Irvis*, 407 US 163, 166-168 [1972]). When evaluating standing in criminal cases, the Supreme Court has consistently held that when a defendant is being prosecuted based on a licensing scheme challenged as unconstitutional, as is the case here, it is the fact of the prosecution that confers standing.

Therefore, defendant has standing to challenge the basis for his conviction even though he did not apply for a New York license to possess his gun in public.

B.

Preservation

The second threshold question is whether defendant's Second Amendment claims are barred by our rules of preservation. The majority so holds, but I disagree. Generally, we will not review a claim raised for the first time on appeal and our preservation rules do not allow a defendant to "sit idly by while error is committed, thereby allowing the error to pass into the record uncured, and yet claim the error on appeal" (*People v Patterson*, 39 NY2d 288, 295 [1976]). However, we have recognized an exception to our preservation rules when an intervening decision from the United States Supreme Court changes the legal landscape, upending established decisional law. In those cases, "the defendant's failure to object to a practice deemed valid in this State cannot deprive [them] of the right to attack that practice when an intervening Supreme Court decision calls that practice into question"

(*id*. at 296; *see also People v Thomas*, 50 NY2d 467, 434 [1980] [along with mode of proceeding error exception to preservation, *Patterson* "also recognized that the defendant's failure to object was excusable because the statutory practice had previously been deemed valid and had only been called into question by an intervening Supreme Court decision"]). As the Court has recognized, "[w]ere we not to treat appellant's claim on the merits, [they] would be deprived of a State forum in which [their] arguments could be heard" (*Patterson*, 39 NY2d at 296). This "intervening decision" exception dovetails with our rule that a party must raise a claim at the first possible opportunity (*id*. at 295). Since a party cannot raise a claim of which they are unaware, preservation is no bar to appellate review.

In *Bruen*, a majority held that the "plain text" of the Second Amendment "presumptively guarantees . . . a right to 'bear' arms in public for self-defense," because "nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms" (*Bruen*, 142 S Ct at 2134). The majority adopted a "historical tradition" test, analogizing to historical factors considered in First Amendment constitutional jurisprudence (*id*. at 2126 [rejecting the two-step test in *Heller* in favor of a test on regulations where "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"]). Under that test, the majority concluded that New York's "proper cause" licensing requirement had no historical justification: "Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" (*id*. at 2156). Therefore, public carry is presumptively

permitted, subject to restrictions, rather than presumptively prohibited, subject to exceptions or extenuating circumstances (*id*. at 2135).

The *Bruen* majority's holding was a sea change in the law, replacing the means-end intermediate scrutiny universally applied by courts throughout the country after the Supreme Court's *Heller* and *McDonald* decisions in cases challenging state gun licensing schemes, with a historical originalist analysis (*see Taveras v New York City*, 2022 WL 2678719, *1 [2d Cir July 12, 2022, No. 21-398] [in *Bruen*, "the Supreme Court expressly rejected the two-part test that this Circuit – and many others – had been applying to Second Amendment claims . . . neither the district court nor the parties' briefs anticipated and addressed this new legal standard"]; *Range v Atty Gen. United States of Am*., 69 F4th 96, 101 [3d Cir 2023] ["*Bruen* abrogated our Second Amendment jurisprudence"]; *United States v Rahimi*, 61 F 4th 443, 450–451 [5th Cir 2023], *cert granted* 143 S Ct 2688 [2023], quoting *In re Bonvillian Marine Serv., Inc*., 19 F4th 787, 792 [5th Cir 2021] ["*Bruen* clearly 'fundamentally change[d]' our analysis of laws that implicate the Second Amendment (internal citation omitted) rendering our prior precedent obsolete"]).

Licensing requirements generally survived intermediate scrutiny based on the government's undisputed interest in public safety (*Kachalsky v County of Westchester*, 701 F3d 81, 85 [2d Cir 2012]; *New York State Rifle & Pistol Assn., Inc. v Beach*, 354 F Supp 3d 143, 148 [ND NY 2018]; *Libertarian Party of Erie County v Cuomo*, 970 F3d 106, 114 [2d Cir 2020]). That was the well-established jurisprudence in New York by 2018 at the commencement of defendant's trial. For example, in 2012, the Second Circuit Court of

Appeals considered whether the Second Amendment guarantees a right to possess and carry weapons in public for self-defense, rendering unconstitutional New York's licensing requirement that an applicant establish "proper cause" to carry a weapon outside the home or business (*Kachalsky* at 83). *Kachalsky* rejected the plaintiffs' proposed Second Amendment analytic paradigm, grounded solely on what the plaintiffs claimed was a history and tradition of a Second Amendment right to carry handguns in public (*id.* at 96). The Court noted that history was "highly ambiguous" and certainly could not be the sole legal lens by which to assess plaintiffs' constitutional challenge (*id.* at 91). Having rejected the premise that the Second Amendment protects unregulated public carry, the Second Circuit turned to the question of the proper standard by which to assess the constitutionality of the challenged licensing requirement. The Court reasoned that because the United States Supreme Court in *District of Columbia v Heller* identified the "core" Second Amendment protection as the "right of law-abiding, responsible citizens to use arms in defense of hearth and home" (*Kachalsky* at 93, quoting *Heller*, 554 US 570, 634-645 [2008]), intermediate scrutiny is the proper standard "when the regulation does not burden the 'core' protection of self-defense in the home" (*Kachalsky* at 93). Applying that standard, the Court concluded that the proper cause requirement was sufficiently related to New York's "substantial, indeed compelling, governmental interests in public safety and crime prevention" (*id.* at 97).

A year later, in *People v Hughes*, our Court held that the defendant's sentence as a prior felon for weapon's possession in the defendant's home did not violate his Second

Amendment right to keep and bear arms (22 NY3d 44, 50-51 [2013]). We assumed without deciding that defendant's sentence was subject to the Second Amendment and acknowledged that the level of scrutiny applicable to Second Amendment claims was "left unanswered by the Supreme Court in *Heller,*" but that several federal courts of appeals had applied intermediate scrutiny (*id*. at 51, citing *Heller v District of Columbia*, 670 F3d 1244, 1261-1264 [DC Cir 2011]; *United States v Booker*, 644 F3d 12, 25 [1st Cir 2011]; *United States v Masciandaro*, 638 F3d 458, 471 [4th Cir 2011]; *United States v Chester*, 628 F3d 673, 683 [4th Cir 2010]; *United States v Marzzarella*, 614 F3d 85, 97 [3d Cir 2010]; *United States v Reese*, 627 F3d 792, 802 [10th Cir 2010]; *United States v Skoien*, 614 F3d 638, 641-642 [7th Cir 2010 en banc]). We noted that "the Supreme Court's *Heller* opinion itself seems to point in the direction of intermediate scrutiny" and reasoned that under that standard, "preventing the criminal use of firearms is an important objective; and keeping guns away from people who have shown they cannot be trusted to obey the law is a means substantially related to that end" (*Heller* at 52).

The majority concludes that defendant failed to preserve his constitutional claim, relying on three factors the majority deems dispositive. First, the majority states that at the time of defendant's trial defendant's claims were not foreclosed by binding precedent (*Cabrera*, decided today, majority op at 12). This is a paper tiger because *Kachalsky* and *Hughes* make clear, under the case law as it stood at the time of defendant's trial, the challenges he now asserts would have been rejected outright.

The second and third factors raised by the majority are easily dispensed with. Contrary to the majority's assertion that *Bruen* does not directly implicate the constitutional issues at play in *People v Baker* (23 NY2d 307 [1968]) and *Patterson* (39 NY2d at 295-296; *Cabrera*, decided today, majority op at 16), *Bruen* is indistinguishable in that its holding is at the core of the constitutional challenges raised here. The majority's interpretation of the holding in *Bruen* ignores the import of that decision and its effect on gun possession regulation throughout the country. The *Bruen* majority changed the legal standard for evaluating regulations on public possession of firearms, holding that public possession of firearms is a right protected by the Second Amendment on equal standing with the First Amendment, subject to the same constitutional protections as home possession. Defendant grounds his claim on this now-firmly established right and relies on the Supreme Court's historical tradition test to argue the unconstitutionality of his conviction under New York's gun possession laws. There is no oxygen between the *Bruen* majority's doctrinal pronouncements and defendant's claims.

The majority's third basis for deploying the preservation rule is to ensure an adequate record for appellate review (*Cabrera*, decided today, majority op at 10). I agree that a rule requiring preservation of all available claims incentivizes parties to adequately raise and argue those claims. However, the majority's rule is an ineffective means to achieve that end as applied to claims that are only viable after trial because of an intervening Supreme Court decision. Moreover, nothing bars us from remitting for a full

development of the factual record so that a defendant and the prosecution may present their arguments under the historical tradition test.

The most troubling aspect of the majority's standard is that requires prescience on counsel's part akin to clairvoyance. For example, the majority asserts that counsel should have made the arguments in defendant's New York criminal prosecution that eventually succeeded in *Bruen*, notwithstanding Second Circuit precedent rejecting those same claims and their underlying analysis. In support, the majority states that *Kachalsky* did not bind our Court (*Cabrera*, decided today, majority op at 13). That's true, but neither did the decisions from the Seventh and D.C. Circuits—including the respective dissenting opinions by two judges before their appointment to the Supreme Court—cited by the majority as providing a basis for counsel to have realized that they should have asserted claims long rejected by both the Second Circuit and this Court (*Kachalsky*, 701 F3d 81; *Hughes*, 22 NY3d 440). The majority's citation to *Peruta v County of San Diego* (742 F3d 1144, 1167, 1173-1175, 1179 [9th Cir 2014], *revd on reh en banc*, 824 F3d 919 [9th Cir 2016]) is especially curious, because that Court (sitting en banc) employed a historical analysis and yet concluded that the Second Amendment does not protect a public carry of concealed weapons and upheld California's good cause requirement.[3] None of these

---

[3] California's licensing statute provided as follows:
> "The sheriff of a county may issue a concealed carry license to a person upon proof of all of the following:

> (1) The applicant is of good moral character.

> (2) Good cause exists for issuance of the license.

decisions could or should have put defense counsel on notice that theories shopped around the country with limited success—and having failed miserably in New York—would miraculously be embraced as winning arguments in our state trial courts.

In essence, the preservation rule adopted by the majority places an unduly high burden on counsel. Counsel is not required to divine the possible future success of formerly rejected claims. In the context of ineffective assistance of counsel claims, courts reject the high bar the majority now applies to our rules of preservation—rules intended to ensure claims are properly considered before reaching our Court. In fact, this Court should take care to avoid promulgating a preservation doctrine that incentivizes clogging trial court dockets with meritless claims foreclosed by precedent. In *Reed v Ross*, the Supreme Court noted:

> "[I]f we were to hold that the novelty of a constitutional question does not give rise to cause for counsel's failure to raise it, we might actually disrupt state-court proceedings by encouraging defense counsel to include any and all remotely plausible constitutional claims that could, some day, gain recognition. Particularly disturbed by this prospect, Judge Haynsworth, writing for the Court of Appeals in this case, stated: 'If novelty were never cause, counsel on appeal would

---

(3) The applicant is a resident of the county or a city within the county, or the applicant's principal place of employment or business is in the county or a city within the county and the applicant spends a substantial period of time in that place of employment or business.

(4) The applicant has completed a course of training as described in Section 26165" (Cal Penal Code. § 26150[a]).

be obliged to raise and argue every conceivable constitutional claim, no matter how far fetched, in order to preserve a right for post-conviction relief upon some future, unforeseen development in the law. Appellate courts are already overburdened with meritless and frivolous cases and contentions, and an effective appellate lawyer does not dilute meritorious claims with frivolous ones. Lawyers representing appellants should be encouraged to limit their contentions on appeal at least to those which may be legitimately regarded as debatable'" (*Reed v Ross*, 468 US 1, 15-16 [1984], quoting *Reed v Ross*, 704 F2d, 705, 708 [1983]).

As Justice Marshall stated in *Farmer v Sumner*, "[t]he fact that petitioner did not raise a *Booth* claim below rather obviously reflects the fact that *Booth* had not been handed down at the time. Petitioner should not be penalized for not being prescient" (489 US 1060, 1060 [1989] [Marshall, J., dissenting]). Similarly, counsel cannot be faulted for failing to intuit that almost a decade after *Hughes*, the Supreme Court would adopt a completely different legal framework and hold the proper cause provision unconstitutional.

The standard adopted by the majority "cut[s] back on the hard won exemptions by which we have softened the rigors to the preservation doctrine when applied to certain fundamental constitutional rights" (*People v Thomas*, 50 NY2d 467, 474 [1980] [Fuchsberg, J., concurring]). Our "procedural rules should be so designed as to keep unjust results to a minimum" (*People v Finch*, 23 NY3d 408, 416 [2014]).

Defendant raised his claims—now viable under *Bruen*—at the earliest possible opportunity, after the United States Supreme Court replaced New York's constitutional method for analyzing Second Amendment challenges to the Penal Law criminal weapons

possession provisions and the public gun possession licensing scheme. Therefore, they are reviewable on this appeal.

## III.

## Facial Challenge to Penal Law § 265.03

Defendant's facial challenge that the entirety of New York's gun licensing regime is unconstitutional is without merit. The petitioners in *Bruen* did not challenge Penal Law § 265.03 (3)—the section defendant was convicted of violating. More to the point, the *Bruen* majority struck down only the "proper cause" provision of the regulatory scheme, which required that an applicant for a public carry license establish that they had a reason other than self defense protection to possess a gun in public (*Bruen* at 2125). Defendant's suggestion that the majority's holding nullifies New York's regulation of public gun possession is belied by the *Bruen* majority's reference to certain common regulatory requirements (*id*. at 2138), as well as Justice Kavanaugh's concurring opinion, joined by Chief Justice Roberts, that states are not prohibited "from imposing licensing requirements for carrying a handgun for self-defense" (*id*. at 2161). A solid majority of the United States Supreme Court recognizes some form of gun possession regulation as constitutional.

IV.

<u>As-Applied Challenge</u>

While remittal is appropriate to develop the factual record under the historical tradition test, defendant's as-applied challenge to the statute and licensing regulations does not require this outcome and is inappropriate for remittal. Defendant did not apply for a permit to carry a weapon in public in New York. That failure is fatal to his claim because he has deprived the State of an opportunity to assess his eligibility for a license. Indeed, we do not know if defendant would have been issued a license had he applied. Crucially, defendant testified that he applied for a Utah license because it would have been difficult to secure a gun possession license in New York, citing expense and that the license would only be valid in the borough where he lived. Neither of these reasons implicate the proper cause provision (*International Bhd. of Teamsters v United States*, 431 US 324, 364-368 [1977]; *see also Bordell v General Elec. Co.*, 922 F2d 1057, 1061 [2d Cir 1991] [requiring plaintiff to show "objective evidence to substantiate his claim that the challenged conduct has deterred him from engaging in protected activity"]).

Unlike challenges that require a historical tradition record, remittal is not appropriate to address the factual deficiencies in defendant's as-applied claims. Returning the case to the trial court would devolve the proceeding to a quasi-administrative hearing and circumvent the regulatory structure (Penal Law § 400.00). Permitting this end run incentivizes gun owners to flout the State's licensing laws, increasing the risk to the public and gun-related violence. The fact is that the *Bruen* majority did not abolish New York's

licensing regime but instead reaffirmed regulation as constitutionally permissible (*Bruen* at 2138).

V.

<u>"Intent to Use Unlawfully" Presumption in Penal Law § 265.03 (1) (b)</u>

Defendant claims that Penal Law § 265.03 (1) (b), which bars the "intent to use unlawfully" is unconstitutional under *Bruen* due to the presumption that possession of an weapon is evidence of the intent to use that weapon unlawfully. Penal Law § 265.15 (4) provides that "the possession of any person of any instrument, appliance, or substance, designed, made, or adapted for use primarily as a weapon is presumptive evidence of intent to use the same unlawfully against another." Given the *Bruen* majority's holding that the Second Amendment guarantees the right to carry a weapon in public for self-defense, the statutory presumption is unconstitutional on its face as it requires the jury to assume a defendant intends an unlawful use of a weapon merely because they possess the weapon in public. Following *Bruen*, which held that public possession is protected by the Second Amendment, there simply cannot be a criminal statutory presumption that mere public possession—not just unlicensed public possession—can be presumed to indicate an intent to use unlawfully.

## VI.

## Restrictions on Voir Dire

Defendant advances meritorious claims based on the court's limitations during the voir dire of the venire. Thus, even if his Second Amendment challenge is unpreserved, he is entitled to reversal and a new trial as I discuss below.

## A.

## Jury Selection

The year of defendant's trial, there were over 300 mass shootings in the United States.[4] The evening between the second and third round of voir dire, 13 people were killed in a mass shooting in Thousand Oaks, California. Multiple jurors alluded to the mass shootings in the news when discussing their views on gun ownership. Defense counsel successfully challenged for cause several prospective jurors based on the venirepersons' express and potential bias regarding gun control. After several rounds of questioning, during the final round, the court restricted counsel's prior line of inquiry on gun ownership. Efficient administration of a trial is within the trial judge's discretion, but the sudden prohibition on questions that had surfaced actual and implicit bias in the prior rounds was error.

---

[4] "Mass Shootings in 2018," Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-shooting?year=2018 (defining "mass shooting" as a single incident in which four or more people, not including the shooter, are "shot and/or killed" at "the same general time and location").

The line of questioning, which drilled down to the venirepersons' sensibilities about guns, was critical to identifying express and implicit bias. For example, counsel asked, "Would you all promise me that you will follow the New York State law as it applies to the facts in making your determination?" Despite potential jurors responding that they could "follow New York State law" regarding guns, they back tracked upon further questioning. Indeed, when later asked their specific views about guns, some potential jurors gave answers indicating they could not in fact be fair in defendant's gun case. For example, after one potential juror agreed that the general public should be barred from possessing firearms, the court clarified that "the real question is, will you be willing, can you, will you apply the law that applies to this case, to the facts as you find them to be and make a decision." The prospective juror candidly responded, "No. No. I mean given what's going on in the world right now with guns, I just, no." Another prospective juror flat-out denied they could put aside any bias, declaring: "I won't be able to be fair to anyone that was carrying a gun in Manhattan."  A New York City elementary school teacher affirmed she could follow the law, but was so emotional when discussing the dangers of guns near children that the judge dismissed her for cause because of her "quivering" voice and "shaking" body that was "beyond voluntary control" when discussing her views on guns.

And so the voir dire progressed during four rounds with nine jurors selected, and twenty-one persons dismissed for cause, almost all due to an inability to be fair. Nevertheless, in the fourth round, the court expressed "frustrat[ion] by the lack of progress" with jury selection, which by then had taken two days. Then, before round five of jury selection, the prosecutor expressed concern that sixty-five additional prospective jurors

may not be enough to seat a jury due to the number of for-cause challenges. The court raised scheduling concerns and indicated that jury selection needed to be completed that day. During this discussion, the court instructed the lawyers not to ask about case facts, or out-of-state licenses, stating, "I absolutely don't want you to go there," because that line of questioning would be "confusing" to the prospective jurors. Defense counsel objected to the court's limitation on asking the prospective jurors' views about guns. In response, the court clarified that counsel "[can] ask if they will follow the law regarding firearms regardless of their personal views about whether individuals should be able to have a *licensed firearm* or not . . . but not about the general view of firearms."

After that directive, the court interrupted defense counsel when he started to ask, as he had in previous rounds, whether anyone other than the police or military should have guns:

> "[DEFENSE COUNSEL]: * * * Let me put a question to the panel, I ask for hands. Who here thinks that individuals other than police officers and the military should not have firearms?
>
> THE COURT: Well, that's not the question, counsel.
>
> The question is, will the jurors be able and willing to follow the law in our state as it applies to firearms?
>
> * * *
>
> (On-the-record discussion held at sidebar.)
>
> * * *
>
> [DEFENSE COUNSEL]: * * * [With a] lot of bonafide[] cause challenges, the information only was extracted upon questions put to them about their views, which then allowed them to feel comfortable enough to say honestly I cannot be fair.

People who are articulating they could be fair * * * were ultimately struck for cause because when they started talking about these issues, or they were like, you know what, I can't be fair, I had these experiences. I can't be objective.

THE COURT: All right.

What's your position, People?

[ADA]: I think we are getting too far foul about asking gun policy. I think the last round people were getting confused about whether dislike gun generally meant they couldn't be fair in this particular case. So I think we should prevent questions on gun policy, generally.

THE COURT: Okay.

That's my feeling, that your questions are too broad about gun policy. Did we do enough in this state, in this country, it just starts getting way beyond * * * the juror's qualifications to be a fair juror. So I will not allow you to ask that question.

[DEFENSE COUNSEL]: So I won't.

I understand the Court's order to me that I cannot ask questions about gun policy. Fair enough.

May I ask a personal opinion on firearm and individuals who have firearms?

THE COURT: No. You are certainly welcome to ask if they will follow the law regarding firearms regardless of personal views about whether individuals should be able to have a licensed firearm or not. You can ask that. But not about the general view about firearms."

Jury selection concluded at the close of this fifth round.

Defense counsel's voir dire questioning was further curtailed after counsel asked the venire panel, "does anyone have objection to the idea of, if you have a firearm, you can use that to defend yourself or somebody else?" The prosecutor objected, arguing that justification was not at issue. Defense counsel replied that it may have bearing on the

defense's case because "this incident emanates from a confrontation in which …[t]he evidence is [defendant's] girlfriend was assaulted." The court sustained the objection and instructed the prosecutor and defense counsel not to discuss justification or defendant's out-of-state gun permit.

B.

<u>Defendant's Right to Inquire During Voir Dire</u>

The court improperly curtailed defense counsel's voir dire of prospective jurors on their views of gun ownership and justification, even though specific questions about their views had previously resulted in successful for-cause challenges based on pro-gun control bias. In addition, the court denied defendant a fair opportunity to explore the venirepersons' qualifications and potential bias by precluding an entire line of questions on self-defense and defense of a third party.

CPL 270.15 (1) (c) states, in part, that, "The court shall permit both parties…to examine the prospective jurors, individually or collectively, regarding their qualifications to serve as jurors. Each party shall be afforded a fair opportunity to question the prospective jurors as to any unexplored matter affecting their qualifications." The Court has long recognized that, "parties may *always* inquire as to those matters which would constitute a sufficient ground for a challenge for cause" (*People v Boulware*, 29 NY2d 135, 142 [1971] [emphasis added], citing Code Crim Pro §§ 375, 376). As particularly relevant here, a defendant has a "right to inquire as to . . . prejudices [of potential jurors] so as to provide a foundation for a challenge for cause or a peremptory challenge" (*Boulware* at 141). "[Q]uestions related to whether [a prospective juror] would give the defendant a fair trial"

are "the kind . . . which should be permitted during a voir dire" (*id*. at 142). "The Judge

presiding necessarily has broad discretion to control and restrict the scope of voir dire

examination" (*id.* at 139-140). "Any restriction imposed on voir dire, however, must afford

'counsel a fair opportunity to question prospective jurors about relevant matters'" (*People*

*v Miller*, 28 NY3d 355, 358 [2016], quoting *People v Steward*, 17 NY3d 104, 110 [2011]).

The majority attempts to distinguish *Miller* (28 NY3d 355) by mischaracterizing the nature

of questioning in the fifth panel as not limiting a line of inquiry, and only limiting the scope

of inquiry (majority op at 6). This argument fails to address that the court here did in fact

prohibit two separate entire lines of inquiry that had direct implications on whether

prospective jurors could follow the law—if a juror does not believe armed self-defense is

ever lawful, they could not be fair on this jury regarding an "intent to use unlawfully"

charge. Similarly, if a juror believes any possession of firearms outside of law enforcement

should be illegal, they should be questioned on this view affects their ability to fairly

evaluate the facts of firearms charges.

During four rounds of questioning the court permitted defense counsel—and the

prosecutor—to inquire about specific views on firearms, but the court changed course at

the final round in favor of general questions as to whether jurors could "follow the law"

about guns. But a prospective juror may not reveal, or be aware of, their bias without the

prodding of a specific question. Indeed, most people intend to follow the law, but may not

fully appreciate how bias works on the deliberative process. As one of the definitive

treatises on criminal procedure by criminal law scholar and regularly cited expert Wayne

R. LaFave explains, "[d]irect admissions of bias, however, are not frequently made; it is unlikely that a prejudiced juror would recognize [their] own personal prejudice—or knowing it, would admit it" (Wayne R. LaFave et al., *Challenges for Cause*, 6 Crim Pro § 22.3 [c] [4th ed]).  MacArthur "Genius" Award winner, founder and president of Gideon's Promise, professor and defense attorney Jonathan Rapping advises that "[l]awyers should never ask questions like 'Can you be fair?' This question is worse than meaningless in that it causes the juror to perceive what [they are] 'expected' to say and creates an additional hurdle to learning [their] true opinions and assumption" (Jonathan A. Rapping, *Implicitly Unjust: How Defenders Can Affect Systemic Racist Assumptions*, 16 NYU J Legis & Pub Policy 999, 1032 n 139 [2013]).

As scholars and trial lawyers recognize, it is difficult to know, without a line of targeted questions, whether a prospective juror harbors a bias or is unable to be fair. That was the case here, where specific follow up questions revealed some prospective jurors' biases and partiality. Limiting defense counsel's opportunity to delve into potential bias— especially on a sensitive subject like gun ownership and gun control in the wake of nationwide, highly publicized mass shootings—after previously permitting that line of questioning—was an abuse of discretion.

Courts have also recognized the potential ineffectiveness of generalized questions regarding a prospective juror's fealty to the law. For example, in *People v Weber*, the Appellate Division reversed Supreme Court and ordered a new trial, concluding that defendant's for-cause challenge should have been granted when a prospective juror stated that she could "follow the law" but failed to state that she could be impartial (103 AD3d

822, 823 [2d Dept 2013]). Given the prospective juror's response, it was necessary "to ascertain that she would render an impartial verdict based on the evidence" (*id.* at 823). In *United States v Wilson*, a prospective juror stating that he could set aside his belief and follow the law was not enough because the juror's "personal views on this issue" are "closely held and unambiguous" (493 F Supp 2d 465, 450-451 [ED NY 2006]). The United States Supreme Court has also held in death penalty cases that affirmations that a juror can "follow the law" are not enough to address potential bias because there are situations where a juror could, "in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs . . . would prevent [them] from doing so" (*Morgan v Illinois*, 504 US 719, 734-736 [1992]). This is no less true when the topic of inquiry is gun control and the public discourse on mass shootings has the potential to impact individual perceptions of gun owners. Notwithstanding the majority's argumentation, specific questions and follow-ups are required to uncover bias.[5]

In addition to curtailing voir dire on attitudes towards gun ownership and gun control, the court also improperly prohibited defense counsel's questioning on self-defense and third-party defense. Defendant testified that his actions were motivated by fear of an attack on himself and his girlfriend. His defense went directly to the question of his intent

---

[5] The majority notes that a juror raised that she was confused by the line of questioning, which can be an appropriate reason to tailor the scope of voir dire questioning (majority op at 5, 7). However, the juror raised this concern in response to defense counsel's question, "If you had to make a decision right now on his fate, what would be your determination," which the court reasonably struck as confusing. These concerns were not in reference to the specific questions on firearm views or on justification as a defense, the two lines of questioning at issue in this appeal.

to use a firearm and whether he was justified in attempting to protect himself and another. Even though the court precluded any questioning on the topic, the court instructed the jury, "The use of a firearm to engage in conduct that is justifiable under the law is not unlawful. Thus, an intent to use a firearm against another justifiably is not an intent to use it unlawfully." The court thus abused its discretion by restricting voir dire on prospective jurors' views on those matters.

Nor were these errors harmless. Defense counsel was unable to delve into the potential biases of prospective jurors even though this same line of questioning had surfaced prospective jurors' partiality and resulted in successful for-cause challenges. Counsel was also unable to inquire about views on an essential element of the charge: defendant's intent to use the gun unlawfully. The jury notes confirm that his defense claim was an important issue during deliberations.

Under the circumstances, these errors deprived defendant of his right to a fair and impartial jury, and he should be retried before jurors whose potential bias has been adequately tested and purged during voir dire.

I dissent.

Order affirmed. Opinion by Judge Halligan. Chief Judge Wilson and Judges Garcia, Singas, Cannataro and Troutman concur. Judge Rivera dissents in an opinion.

Decided November 21, 2023